## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. 19-19699 |
| | ) |
| v. | ) |
| | ) |
| NEORA, LLC, formerly known as NERIUM INTERNATIONAL, LLC, a Texas limited liability company, | ) ) ) |
| | ) |
| SIGNUM BIOSCIENCES, INC., a Delaware corporation, | ) ) |
| | ) |
| SIGNUM NUTRALOGIX, a Delaware corporation and subsidiary of SIGNUM BIOSCIENCES, INC., and | ) ) ) |
| | ) |
| JEFFREY OLSON, individually and as Chief Executive Officer of NEORA, LLC, formerly known as NERIUM INTERNATIONAL, LLC, | ) ) ) ) |
| | ) |
| Defendants. | ) ) |

## COMPLAINT FOR PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

1

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.       Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.       The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

5.       The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6.       Neora, LLC, formerly known as Nerium International, LLC ("Nerium"), is a Texas limited liability company with a corporate mailing address of 4201 Spring Valley Rd., Suite 900, Farmers Branch, TX 75244. Nerium transacts or has transacted business in this District and throughout the United States. From at least 2015 to the present, acting alone or in concert with others, Nerium has advertised, marketed, promoted, distributed, or sold "Nerium EHT Age-Defying Supplement, Mind Enhancement Formula" ("Nerium EHT").

2

7.      Defendant Signum Biosciences, Inc. is a Delaware corporation with a corporate mailing address at 11 Deer Park Dr., Suite 202, Monmouth Junction, NJ 08852, and was previously located at 133 Wall Street, Princeton, NJ 08540. Signum transacts or has transacted business in this District and throughout the United States. From September 2014 through April 2015, acting alone or in concert with others, through its wholly owned subsidiary, Signum Nutralogix, Signum Biosciences has advertised, marketed, promoted, distributed, or sold the "ME Sports" nutritional supplement. In early 2015, Signum Biosciences licensed eicosanoyl-5- hydroxytryptamide ("EHT"), a proprietary coffee extract and the main ingredient in ME Sports, to Defendant Nerium. At all times material to this Complaint, Signum Biosciences, Inc. has participated in the marketing and promotion of ME Sports and Nerium EHT, primarily from its principal places of business formerly in Princeton, NJ, and now in Monmouth Junction, NJ.

8.      Defendant Signum Nutralogix is a wholly owned subsidiary of Signum Biosciences (together, "Signum"), and has been located at the same address in Princeton, NJ, and now Monmouth Junction, NJ. Signum Nutralogix transacts or has transacted business in this District and throughout the United States. From September 2014 through April 2015, acting alone or in concert with others, Signum Nutralogix has advertised, marketed, promoted, distributed, or sold the ME Sports nutritional supplement. At all times material to this Complaint, Signum Nutralogix has participated in the marketing and promotion of ME Sports and Nerium EHT, primarily from its principal places of business formerly in Princeton, NJ, and now in Monmouth Junction, NJ.

9.      Defendant Jeffrey Olson is the founder and Chief Executive Officer of Nerium. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Nerium, including the acts and practices set forth in this Complaint. Olson provides the strategic vision for Nerium, and is

personally featured in presentations aimed at recruiting consumers both to join Nerium and to purchase Nerium's products. Olson announces all major changes to Nerium's business structure and product offerings, and directly supervises all of Nerium's senior management. Olson resides in Fort Lauderdale, Florida, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMON ENTERPRISE**

10.     Defendants Signum Biosciences and Signum Nutralogix have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. The Signum Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations. Because the Signum Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

**COMMERCE**

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS PRACTICES**

12.     Nerium, founded by Defendant Olson in 2011, is an international multi-level marketing company that sells supplements, skin creams, and other products using a network of "Brand Partners" ("BPs"). Since its inception, Nerium has operated as an illegal pyramid scheme. Unlike a legitimate multi-level marketing business, Nerium's compensation scheme emphasizes recruiting new BPs over the sale of products to consumers outside of the organization. Nerium's business model makes it unlikely that BPs can earn money by selling product to outside consumers in response to genuine

4

demand. Purchases by BPs and fees paid by BPs have accounted for more than half of all company revenues. Indeed, despite Nerium's promises that BPs can earn substantial income and gain financial independence, most BPs make little or no money, and a substantial percentage lose money. According to Nerium's most recent reporting, less than 5% of BPs in the United States earn more from Nerium than they pay in fees and product purchases. At least 92% of Nerium's BPs have quit, with half leaving the company within six months or less.

13.     Since early 2015, Nerium has sold Nerium EHT, a supplement whose primary active ingredient, EHT, is provided exclusively to Nerium by Signum. Defendants promote Nerium EHT for brain health, claiming it can prevent, reduce the risk of, or treat concussions or chronic traumatic encephalopathy (CTE), Alzheimer's disease, and Parkinson's disease. Signum developed the predecessor supplement to Nerium EHT, "ME Sports," and Defendant Signum promoted ME Sports for the same purposes, in collaboration with Nerium marketing personnel. In marketing ME Sports and Nerium EHT, Defendants capitalize on widespread concern about the growing prevalence of Alzheimer's and Parkinson's and the lack of effective treatments. They also capitalize on growing awareness of the frequency and severity of concussions among football players and other athletes, and they recruit athletes to pitch the products to parents and coaches concerned about children's health. Defendants' claims about their supplements are unsupported. As of April 2018, Nerium's total sales of EHT exceeded $120 million.

**Nerium's Recruitment of Brand Partners Incentivizes Substantial Upfront Investments**

14.     Nerium promotes participation in its scheme through a variety of channels, including websites, social media, live presentations, videos, and print materials. In addition to holding one or more conventions each year during which Nerium management and BPs speak about the company, Nerium gives its BPs access to videos and print materials that explain how to recruit others to join.

Nerium's website also serves as a platform for its BPs, providing links to BPs' individual Nerium websites, training conference calls and recordings, and social media outlets.

15.   To become a BP, consumers make substantial upfront investments in Nerium's products. Nerium encourages consumers to purchase one of Nerium's "Success Packs," also known as "Enrollment Packs" ("Packs"), which cost $500, $750, or $1000, and which are only available to the BP at the time of enrollment. The Packs contain motivational and promotional materials for BPs, as well as several bottles of Nerium's products, which Nerium advertises as discounted from their retail value. Alternatively, consumers can purchase a "Basic Kit" for $49.95. The Basic Kit contains only the motivational and promotional materials.

16.   Nerium encourages new BPs to purchase a Pack. Nerium's promotional videos for potential recruits promote these Packs as the best way "to get your business moving fast." In their first month with Nerium, 70% of BPs have spent either $500 or $1000 to purchase one of Nerium's Packs.

17.   In addition to the upfront investment in a Pack, Nerium also incentivizes BPs to commit to designated volumes of product purchases each month. To be eligible for any compensation from Nerium, BPs must either themselves spend at least $80 on auto-delivery products, or convince customers to spend a total of at least $120 on auto-delivery products. Auto-delivery is an open-ended commitment to pay for and receive a product every month until the order is expressly cancelled. Non-BP consumers who agree to purchases through auto-delivery are known as "Preferred Customers." Historically, there was an exception through which BPs could remain eligible to receive compensation if they spent, or convinced "retail customers" to spend, a combined $250 on products each month without the auto-delivery commitment. Auto-delivery orders are discounted by 25% or more from the "retail value" of the product. In addition, auto-delivery orders above certain thresholds qualify for free shipping and other discounts. No discounts are offered for purchases not made through auto-delivery.

18.     Nerium represents to prospective BPs that if they purchase Nerium products at a discount through the auto-delivery program, they will be able to sell those products to potential customers at a profit for the full retail price. Defendant Olson is featured in a Nerium promotional video stating that "I've gone out and shown this product, it's hard to get a No."

**Nerium's Compensation Plan Prioritizes Building the Pyramid Over the Sale of Products**

19.     BPs may earn compensation from Nerium in two forms: selling products directly from Nerium and rewards for recruiting new BPs.  BPs do not receive compensation from Nerium for sales from their personal inventory, but they can retain any profit from products they are able to sell out of their own inventory.  The most BPs can earn through such sales, however, is the difference between the price consumers pay the BP and the price the BP paid to purchase the product from Nerium.  BPs who do not sign up for auto-delivery receive no discount on their product purchases, meaning that sales from their personal inventory would not be profitable even at full retail price.  Even for BPs who sign up for auto-delivery, the profit margin is typically slim or non-existent.

20.     Most sales of Nerium products are shipped directly from Nerium to customers.  BPs can sell directly from Nerium either to Retail Customers, who make one-time purchases of products, or Preferred Customers, who agree to receive a recurring monthly auto-delivery of products. The majority of the compensation paid by Nerium for these sales ends up being paid to the BP's upline rather than the BP who made the sale.

21.     According to Nerium, less than 1% of all rewards paid by the company consist of commissions paid on the sale of products to Retail Customers.

22.     It is difficult for BPs to make any type of product sales because consumers often are able to purchase the products from Nerium or other sources, such as Amazon.com, for as little as or less than the best price the BP can offer to the consumer.

23.     BPs also earn compensation from Nerium by recruiting other BPs.  The compensation Nerium offers for recruiting new BPs is based on various types of "Volume," as defined in Nerium's compensation plan. Nerium defines ten different types of volume, including "Auto-Delivery Volume" ("ADV") (volume generated by the sale of product through auto-delivery), "Qualifying Volume" ("QV") (a product's wholesale cost in dollars), "Personal Qualifying Volume" ("PQV") (the total QV purchased directly from Nerium by a BP or her customers), "Commissionable Volume" (90%-100% of PQV), "Customer Commissionable Volume" (the PQV of purchases by a BP's retail and Preferred Customers directly from Nerium).

24.     Nerium provides much greater compensation for recruiting new BPs—who typically purchase high-volume start-up Packs and agree to auto-delivery—than for sales of products to Preferred Customers or retail customers. Nerium thereby encourages BPs to recruit new members rather than to sell products or services to ultimate users. As one of Nerium's top earners advised in a 2015 promotional video, there are three things BPs should do to "explode" their business: "Number one: Recruit. Number two: Recruit. Number three: Recruit."

25.     For example, Nerium identifies as an "immediate focus" for new BPs the goal of "Fast Start Qualifying" in their first month. Until recently, BPs could Fast Start Qualify in one of two ways: (1) by recruiting three new BPs, generating 2000 QV (including 500 PQV from the recruiter), and meeting certain other requirements, or (2) by enrolling nine new Preferred Customers, generating 1000 ADV, and meeting certain other requirements. The recruiting option paid a bonus of $150, while the sales option paid only $75. The sales option, moreover, was difficult to achieve; less than half of Nerium BPs are able to successfully sign up even a single Preferred Customer in their entire career with Nerium, let alone nine in their first month. The most recent version of Nerium's compensation plan completely eliminates the sales option to qualify for a "Fast Start Bonus."

26.     The rewards available to Nerium BPs increase as the BP ascends in "Rank" in the organization. To advance to a higher rank, a BP must recruit other BPs. BPs generally are also required to satisfy increasingly higher monthly targets for downline volume—that is, activity by a BP's recruits—to reach higher ranks. Nerium claims to offer a "Lifestyle Bonus" of $100,000 per month to participants who ascend to the eighteenth rank, "Gold International Marketing Director."

27.     Certain rewards are only available to higher ranks in the organization. For example, "Team Commissions" are only open to participants who have reached certain minimum ranks. Approximately one-third of all Nerium rewards are paid in the form of Team Commissions, which are based primarily on product purchases by recruits in one's downline.

28.     Nerium nominally offers commissions for the sale of products at rates of 5%- 15%, but the actual commissions paid out can be significantly lower, because commissions on the sale of products are earned only when a BP's QV exceeds 300 per month. Until recently, commissions were only paid on sales above the monthly QV threshold, making the actual commission rate much less than the rate promised by Nerium.

### High Attrition Increases Importance of Recruiting

29.     Like many pyramid schemes, Nerium experiences high attrition by BPs.  High attrition means that building and maintaining a downline organization of any desired size requires a perpetual focus on recruiting and replenishing.

30.     In fact, according to Nerium, more than 92% of consumers who had signed up as BPs with Nerium in the United States since 2012 had quit Nerium by the end of 2017.

31.     High attrition also motivates recruiters to encourage new recruits to make significant upfront purchases before the recruits leave Nerium or stop making purchases.  Indeed, purchases by BPs in their first three months regularly comprise one-third to one-half of all BP purchasing volume,

company-wide. Half of BPs stop purchasing products within six months of joining Nerium. One year after joining, only about a third of BPs still buy products.

### Nerium's Income Misrepresentations

32.     Nerium promotes its business by misrepresenting that BPs can earn a substantial income and achieve financial independence.

33.     The first benefit Nerium touts on its website in describing the business opportunity to potential recruits is "Significant Earning Potential." Nerium promises "lifestyle- changing income" throughout its promotional materials.

34.     Nerium promotional videos often tell recruits that the recruiters earned significantly more money in their first few months or first year as a Nerium BP than they had made in their previous jobs.

35.     Nerium regularly issues press releases announcing new members of its "Million Dollar Club," and parades them on stage to receive oversized images of bonus checks during Nerium conventions.

36.     Social media posts by Nerium BPs tout the significant number of consumers who have become "millionaires" since joining Nerium. Nerium founder Jeff Olson is frequently described by top earners at Nerium as "The Millionaire Maker." Another Nerium Facebook posting targeting women states that: "80% of Women that make a six figure income, do it with direct sales…Be your own Boss! Make your own hours! What other company allows you to work from home and make THOUSANDS of dollars a month with no cost to run your business???"

37.     Social media posts by Nerium itself reinforce these messages. For example, recent postings by Nerium on Facebook feature BPs who were supposedly able to retire from their former

10

jobs. Other Nerium Facebook posts emphasize the entrepreneurial opportunities from joining Nerium, including statements such as "YOU CAN GO TO WORK OR YOU CAN BE THE BOSS."

38.    Social media posts by Nerium BPs describe all the people who have "given up their corporate America 9-5 jobs to work exclusively with Nerium." Nerium BPs commonly post a banner on Instagram and Facebook saying "DON'T LET $50K/YEAR KEEP YOU FROM $50K/MONTH."

39.    Nerium BPs frequently post photos of top earners who supposedly earned bonuses of hundreds of thousands of dollars, and routinely brag about the $30,000 bonuses they say they just earned.

40.    Nerium emphasizes recruiting college students and young adults through its "Young Entrepreneur Program" ("YEP"). YEP promotional videos make particularly egregious income claims, highlighting numerous BPs who claim they are earning "six-figure incomes" or incomes in the "top five percentile" in the United States, paying off student loans in a very short period of time, "retiring" their parents, and able to replace their former income with a single bonus from Nerium.

41.    Nerium BPs frequently describe or exhibit in video presentations the lavish lifestyles they claim to be able to lead as a result of their Nerium income, including paying for extended family vacations to exotic locations, driving luxury automobiles, and purchasing mansions with extravagant amenities.

42.    Despite the claims of profitability, Nerium's compensation plan is structured such that, at any particular time, the majority of BPs will not make the substantial incomes represented, and will, instead, lose money. Even according to Nerium's own data, less than 10% of BPs in the United States earn more than they pay Nerium in fees and product purchases.

43.     Nerium regularly hypes a "free" Lexus automobile—Audis in some markets outside the United States—that BPs can earn from working for Nerium. For example, Nerium posts numerous photographs on its Facebook page featuring BPs posing beside their new Lexuses.

44.     Overall, according to Nerium's own reporting, less than 2% of Nerium BPs reach the Rank, now called Elite Director, that is required to become eligible for the Lexus bonus even for a single month.

45.     In fact, Nerium does not purchase a Lexus for anybody. Nerium merely provides a monthly $500 check to be used toward a Lexus lease. Although the Nerium BPs must maintain the Elite Director rank to continue to qualify for the $500 monthly bonus, the BPs remain liable for the monthly lease payments on the Lexus even if they do not receive the monthly bonus. Alternatively, Nerium recently began to offer Elite Directors the option of receiving $375 cash bonuses in lieu of the Lexus bonus.

46.     The challenging reality of retailing and recruiting has meant that very few Nerium participants get above even the first rung on the organizational ladder. Although there are now eighteen levels in the Nerium business opportunity hierarchy, Nerium reports that more than 85% of BPs have never reached the second rank. Meanwhile, the overwhelming share of rewards accrues to the few individuals who reach the top ranks of Nerium's organization.

47.     In fact, Nerium charges its BPs various fees which typically are far greater than any compensation they pay the BPs. In particular, Nerium BPs have to pay out of their own pockets fees for sales aids, business cards, letterhead, and registration at multiple conferences, including Nerium's annual multi-day "GetReal" conference. In addition, Nerium charges its BPs $30 per month for access to its "Nerium Edge" back-office platform, which allows access to Nerium's mobile app, and is the

exclusive source for most of Nerium's training and promotional aids, as well as all information regarding the BPs' customers.

48.     Due to these numerous fees, according to Nerium's most recent data, more than 95% of Nerium BPs paid more to Nerium each month than they earned in commissions and bonuses. Even amongst only the "active" BPs, Nerium itself reports that the average annual earnings for a BP are only $65. Those earnings are gross, not net: that meager sum does not take into account the significant amounts most BPs are forced to pay for unwanted products to remain active.

49.     Despite promises of financial independence and six-figure incomes, less than 1% of "active" Nerium BPs averaged earnings of at least $530 in any given month. A far smaller number earn that amount *every* month, which would still only result in an annual gross income of less than $6,400.

50.     Moreover, even the smaller-than-promised potential incomes described above do not account for the significant outlays of time and money that BPs are forced to incur just to maintain their business, including traveling around the country to Nerium conferences or meetings, and organizing their own sales events. In addition, since Nerium BPs are not classified as employees but as independent contractors of Nerium, BPs are responsible for paying self- employment taxes and for their own health insurance or other typical job-related benefits.

**Defendants' Deceptive Product Claims**

51.     Since at least 2014, Defendants have made unsupported health claims about two products containing EHT, a molecule derived from coffee: ME Sports and Nerium EHT (collectively, "EHT Products"). Although Signum developed EHT, Nerium Defendants collaborated with Signum since at least the fall of 2014 in marketing EHT Products. Defendants' marketing strategy was to convey to Nerium BPs and consumers these unsupported claims, including that positive results from

13

the testing of EHT on rodents were sufficient to establish that EHT Products can prevent, reduce the risk of, or treat concussions or CTE, Alzheimer's disease, and Parkinson's disease in humans.

52.     These health claims were made as early as September 2014, when Signum launched the ME Sports website with input from Nerium's marketing staff, conveying that EHT could help with CTE, Alzheimer's disease, and Parkinson's disease:



53.     Defendants also have claimed that EHT is scientifically proven to offer users significant health benefits. For example, Nerium has claimed that there is "scientific proof" that EHT is effective, and has cited studies "at Signum and at several Universities" that were published "in peer reviewed journals."  All of the cited studies, however, involved rodents, not humans.  Additionally, Defendants have falsely implied that Princeton University was involved in the development of EHT.

54.     Defendants also have claimed that Signum has succeeded in developing medical breakthroughs relating to Alzheimer's and Parkinson's where actual pharmaceutical manufacturers have failed.

55.     After developing EHT, Signum approached several pharmaceutical companies about distributing it, but those companies insisted that human clinical trials be conducted to determine what claims could lawfully be made in marketing EHT. Signum initially planned to proceed with clinical testing but ultimately rejected that approach as too costly. Instead, Signum planned for Nerium's network of hundreds of thousands of BPs—who were incentivized to recruit others to the scheme and generally had no scientific background—to distribute EHT Products and spread claims about it by "word of mouth."

### Marketing Collaboration Between Nerium Defendants and Signum

56.     Even before launching their formal partnership in April 2015, Nerium and Signum collaborated on promoting EHT. Beginning no later than the fall of 2014, Nerium and Signum worked together on a campaign to create consumer interest in a dietary supplement containing EHT. Among other things, Nerium retained a public relations firm to increase public awareness of EHT, build Signum's social media presence, create promotional videos featuring Signum CEO Maxwell Stock and his father Dr. Jeffry Stock, Signum's Chairman, and share content directing consumers to the ME Sports website. Nerium and Signum also collaborated on the content and format of Signum's ME Sports website.  Indeed, Signum was able to make changes to that website only by requesting such changes from Nerium.

57.     Nerium Defendants helped Signum to promote ME Sports in order to drive Nerium EHT sales after that product was launched.  As Signum's Director of Communications explained in an October 7, 2014 email to Defendants' advertising agency, Nerium's "goal is to build SEO [search

15

engine optimization] for EHT so that there is buzz around EHT that will help their product launch."
Even with Nerium's involvement, however, Signum's Director of Communications reminded the
outside agency in a subsequent email the same day, "[r]emember like we said in the meeting
Signum(max) has final say over everything that [the agencies] do for our brand."

58.     In February 2015, as part of the joint marketing effort with Nerium, Signum issued a
press release from its New Jersey headquarters claiming that EHT "may be a significant contributor to
the reduced risk for consequences of inflammation and for neurodegenerative diseases, such as
Alzheimer's disease, CTE (Chronic Traumatic Encephalopathy) and Parkinson's disease." Signum
explained that EHT provides these benefits because it "protects and strengthens neuronal structures by
preventing damage to tau, an essential brain protein." To buttress this claim, Signum asserted that
EHT was discovered "in a partnership between Princeton University and Signum Biosciences." The
press release advertised Signum's product, stating, "Currently, the ingredient can be found exclusively
in ME$^{TM}$ sports…" Signum's press release promoting EHT remains publically accessible online (at
https://www.prweb.com/releases/2015/02/prweb12530657.htm), on Signum's Twitter feed, and on
Nerium BPs' social media pages.  The press release was drafted by a public relations firm retained by
Nerium and was reviewed by Nerium and Signum officials prior to being issued.

59.     During the period of this collaboration, but before the launch of Nerium EHT, Signum
marketed, sold, and distributed ME Sports, a dietary supplement containing EHT as its primary
ingredient. A bottle of ME Sports contained 30 tablets and was sold for $59.99.

**Launch of Nerium EHT**

60.     In April 2015, pursuant to an exclusive license granted by Signum, Nerium began
marketing and selling "Nerium EHT." Like ME Sports, Nerium EHT contained EHT as its primary
active ingredient, was sold in boxes containing 30 tablets in blister packs, and was marketed using the

16

same unsubstantiated health claims. A bottle of Nerium EHT provides a 30-day supply if taken once daily according to the product label's suggested use. The product can be purchased on Nerium's website for $80/bottle, or for $60/bottle with a monthly auto-delivery order.

61.     Defendants formally announced their partnership and the launch of Nerium EHT at Nerium's GetReal Conference for BPs in April 2015. Presenting EHT to thousands of BPs at the April 2015 GetReal Conference, a Signum representative touted the significant funding Signum received from the Michael J. Fox Foundation and linked the claim that EHT protects and stabilizes proteins in the brain to the brain damage suffered by NFL player Junior Seau. Immediately afterwards, Jeff Olson told the crowd, "a lot of things you can't say, we'll talk about that later on, because all those things you can't say – it does!"

62.     At the time, Nerium's website had no information on the new Nerium EHT product, so the ME Sports website was the only source of information about Nerium EHT.  Many Nerium BPs visited the website to learn more about Nerium EHT and to purchase samples.  As further described below, the ME Sports website contained a series of images and other information conveying that the ME Sports product can prevent, reduce the risk of, or treat CTE, Alzheimer's disease, and Parkinson's disease.

63.     In an April 2015 email, Nerium's leading BP asked Defendant Jeff Olson and Nerium's marketing director whether content from the ME Sports website would be copied into Nerium's Digital Library, allowing BPs to easily provide that information to prospects. Nerium's marketing director responded that some of the content is only on Signum's website "on purpose" because Nerium "cannot use/say [it] from reg[ulatory] standpoint."

64.     Since the launch of Nerium EHT, Signum has continued to participate in the marketing of Nerium EHT, including providing information and resources relating to EHT Products on Signum's

website and social media.  Defendants understood that even if Nerium purported to forbid certain disease claims, the Nerium BPs would still spread those claims in talking to potential customers and recruits.  In a May 2015 email, for example, Signum's Chief Science Officer indicated that Nerium "doesn't care" if the company is not authorized by the Canadian government to make certain claims because "the BPs will spread all the claims 'by word of mouth.'"

65.     As further detailed below, during the entire period that EHT Products have been marketed and sold to consumers as ME Sports or Nerium EHT, Defendants have collaborated in making claims that the products and their primary active ingredient, EHT, prevent, reduce the risk of, and treat Alzheimer's disease; prevent, reduce the risk of, and treat Parkinson's disease; and prevent, reduce the risk of, and treat concussions or chronic traumatic encephalopathy ("CTE").

## Defendants Encouraged BPs to Make Deceptive Claims

66.     To support their claims, Defendants relied only on rodent studies, but they repeatedly conveyed to Nerium BPs who bought and sold Nerium EHT that these rodent studies were sufficient to establish the efficacy of EHT on humans. For example, immediately after Nerium EHT's launch in April 2015, Signum's Chief Science Officer and Nerium's Vice President of Scientific and Regulatory Affairs together drafted an FAQ response to the question "How do you know EHT works on humans if you have not tested it on humans?" The response describes how the commonality between human and animal genes means "positive results in these models provides compelling evidence that EHT will be able to modulate those same key, conserved signaling proteins in humans."  This and other FAQs were then disseminated to Nerium customer service representatives.  Moreover, Signum representatives provided the same response to direct questions from Nerium BPs about whether the rodent studies were sufficient to make claims about EHT's effectiveness on humans, even as late as a year after the launch of EHT.

18

67.     As described above, at the April 2015 GetReal Conference announcing the EHT launch, immediately after a Signum representative gave a brief presentation about EHT, Defendant Jeff Olson told thousands of BPs attending the conference: "…a lot of things you can't say, we'll talk about that later on, because all those things you can't say – it does!"

68.     Not surprisingly, Nerium BPs almost immediately began publicizing EHT as a cure for neurodegenerative diseases. For example, within two weeks of the April 2015 GetReal Conference announcing the launch of Nerium EHT, Signum's Director of Communications notified Nerium about statements being made by Nerium BPs about EHT that were compiled on a third-party website that evaluates dietary supplement claims. The website cited Nerium claims that EHT will "reduce the chances of developing degenerative diseases like Alzheimer's."

69.     Despite knowing about the claims BPs were making, a Signum representative still encouraged the thousands of BPs attending the September 2015 GetReal Conference to review Signum's website and to share the information and resources there with potential customers. That website included information on EHT studies on rodents relating to Alzheimer's disease, Parkinson's disease, and other neurodegenerative disorders, but the website did not make clear—nor does it today—that such studies are insufficient to substantiate efficacy in humans.

70.     Despite purportedly policing the claims made by BPs, Defendants knew that BPs continued to make deceptive claims about EHT.  For example, more than a year after the EHT launch, Signum's Chief Science Officer wrote to Nerium's Digital Marketing Manager about Nerium BPs making unsubstantiated claims about EHT, attaching internal Signum emails describing how Nerium's social media monitoring was not effectively policing "outlandish claims" that BPs were making about EHT.

**Defendants' Deceptive CTE-Related Marketing of EHT Products**

71.     Since at least 2015, in the course of advertising, marketing, and promoting EHT

Products, Defendants have represented that the products help prevent, reduce the risk of, and treat

concussions and CTE, a degenerative brain disease found in individuals who have experienced

repetitive head trauma, such as athletes or veterans.

72.     These claims have been made in print, online, and on social media, and they often focus

on the purported benefits of EHT Products to athletes, particularly football players who experience

concussions.

73.     For example, containers of ME Sports displayed the image of a football player and

advertised "Brain defense with EHT" and "Brain defense with EHT on and off the field":





74.     Signum's ME Sports website—created with input from Nerium's marketing staff—contained similar imagery, and included the text "Be Smart. Play Safe. Stay Strong with EHT" alongside a young boy in a hockey helmet:



21

75.     Elsewhere on the ME Sports website, a high school football player was featured prominently alongside the text "Impact on the field could damage your brain. Stay Strong with EHT":



76.     The ME Sports website also displayed a soccer player alongside the text "Repetitive head trauma can lead to neurodegenerative diseases like CTE. Stay Strong with EHT":



77.     Elsewhere on the website, Signum devoted a full page to CTE alongside the claim that "ME Sports helps to protect and enhance your brain…":



78.     As noted above, at the time Nerium EHT was launched at the Nerium GetReal Conference in April 2015, Nerium's website had no information on the new Nerium EHT product, so the ME Sports website was the only source of information about Nerium EHT.  Many Nerium BPs visited the ME Sports website to learn more about EHT and to purchase samples.

79.     Also as noted above, in a February 2015 press release, Signum claimed that EHT "may be a significant contributor to the reduced risk for consequences of inflammation and for neurodegenerative diseases, such as Alzheimer's disease, CTE (Chronic Traumatic Encephalopathy) and Parkinson's disease."

80.     The next month, in March 2015, Nerium and Signum collaborated to launch an EHT promotional campaign focused on Brain Injury Awareness Month, an event through which the Brain Injury Association of America aims to build awareness of brain injury.

81.     As the centerpiece of their promotional campaign, Defendants employed athletes who had suffered concussions to tout EHT's purportedly beneficial impact on their brains.

82.     For example, as part of the campaign, ex-NFL players Sidney Rice and Steve Weatherford were hired to discuss their history of concussions and to extol EHT's benefits to brain health. Weatherford even spoke about Junior Seau, who suffered from CTE and committed suicide.

83.     Images and video of Rice and Weatherford in front of an EHT promotional backdrop were widely disseminated online and on television:



84.     Steve Weatherford thereafter continued his efforts on Defendants' behalf to make the connection between EHT and concussions.  On December 27, 2015, Mr. Weatherford was interviewed on MSNBC regarding the new movie "Concussion," and in the interview, he commented on concussions and how playing in the NFL can lead to head injuries.  An Account Coordinator with Defendants' public relations firm subsequently sent an email to various Signum and Nerium officials,

including Nerium's Chief Marketing Officer, noting that although Weatherford "did not mention EHT in the interview, we're excited that he did include why he takes EHT in his follow up and social media posts!"  The email included links to Weatherford's posts on Instagram, Twitter, and Facebook.  The Facebook post was shared at least 3400 times.  Nerium's Chief Marketing Officer sent a one word reply to all of the recipients of the earlier email: "Awesome!"

85.     At Nerium's September 2015 GetReal Conference, a Signum representative encouraged the attendees to go to Signum's Facebook page to review EHT success stories, relaying two examples that could be found there: "[T]here's a Princeton undergrad, his name's Chuck, and he's a star, star running back.  Freshman year, he had a stroke and he couldn't walk . . .  And we were able to turn him on EHT and change his life and really help him, as well as somebody else who suffered from traumatic brain injury. He was an electrician [who] fell down and we supported him in what he was trying to do and spread the message of brain health, and—and you can find these individuals on our Facebook page *and share their stories as well*."

86.     In fact, Signum already was well aware that Nerium BPs were consulting Signum's Facebook page.  In June 2015, Signum's management reported to the company's board that Signum's Facebook page had attracted no views until the EHT partnership with Nerium was announced at the April 2015 GetReal Conference, but that Signum had 66,000 likes only four days later.

87.     To further market Nerium EHT as beneficial to athletes, Nerium retained other ex-NFL players as BPs.

88.     In April 2016, for example, ex-NFL player Cory Redding Jr. became a Nerium BP and announced that:

> After playing football for 13 years in the N.F.L., and suffering two concussions, I knew there had to be a product out there to help me fight against potential problems associated with brain trauma. Once I did my research I found exactly what I was looking for…EHT.

26

89.     Additionally, Defendants have encouraged BPs to market Nerium EHT by making CTE-related claims.

90.     For example, Defendant Signum shared the following photo on Facebook in March 2017, which shows bottles of Nerium EHT in the foreground with images of football players, displayed on bottles of ME Sports, in the background:



91.     Defendants have also encouraged BPs to reach out to gyms and athletic organizations to promote the product's ability to repair the brain damage caused by CTE, including in sales training materials Nerium provides to BPs.

92.     Additionally, Signum created an "FAQ" document that Defendants used to give BPs tips on how to "reach boxers and how EHT may help/or [sic] reaching football athletes and teams."

93.     At Nerium's GetReal Conference in 2015, a Signum representative told thousands of BPs to share information about EHT's effects with "anybody that you might know that can benefit," such as "athletic directors from football programs[.]"

94.     In a widely circulated promotional video for EHT entitled "Hard Hits Contact Sports And Your Brain," a Signum representative claimed that "if you have to play contact sports, if you have to hit your head regularly… it's really important for you to take this product."

95.     Over social media, Defendants cause claims to be disseminated about EHT's ability to prevent and reduce the risk of concussions and repair the brain damage caused by CTE. Examples of such claims made on social media include:

a.     "EHT has been scientifically proven to help those with past concussions and will help protect your brain from a possible concussion." (Ellen Kemprowski Facebook, December 9, 2016);

b.     "EHT was researched on Pro Football players that sustained concussions. Guess what?? EHT REPAIRS THE BRAIN!!" (Mechelle Jackson Celie Facebook, November 7, 2016);

c.     "Do your kids play sports? Ever have a concussion? EHT helps heal Chronic Traumatic Encephalopathy." (Janice Guazzo Facebook, August 28, 2016);

d.     "Concussion damage comes in many ways. If you have had one, consider looking into how #EHT can help!" (Angel Johnstone Facebook, February 21, 2016);

e.     "If you or someone you know has had a concussion, please PM me to get this critical information on how EHT can repair your damaged brain." (Darlene LeClair Facebook, June 27, 2016);

f.     "I've never been more proud to represent Nerium products. Our EHT not only heals damage to the brain but also helps to fortify and protect the brain from

28

further damage. Our products are the only ones proven to heal CTE." (Charles

Griffin Facebook, November 9, 2017);

g.  "Ever had a car accident with head trauma or played sports and had fallen or hit

in the head? EHT is the only All natural brain health supplement that heals and

repairs Neuronal integrity and so much more!" (Amy Rainey Pickett Facebook,

March 14, 2018);

h.  "If your child plays contact sports or other risky activities – cheerleading,

bike/ATV racing, etc. – your child is AT RISK of concussion or brain injury!!!!

Our all natural BRAIN HEALTH SUPPLEMENT protects and works correcting

problems within the neuronal networking of the brain. → THINK: Concussion

→ THINK: CTE → THINK: Brain/head trauma … #EHT … #alzheimers #nfl

#concussions." (Fran Taylor Moore Instagram, March 8, 2018);

i.  "60 Minutes just did an episode on CTE, combat blasts, Brain Health and Tau

Protein … check out our EHT supplement! #EHT #brainhealth #braininjury

#woundedvets #concussions." (sunycaligirl Instagram, September 25, 2018).

j.  "5.3 Million Americans are living with traumatic brain injury disability.

Scientists believe CTE in NFL players began at youth. 1 in 3 men who played

contact sports as a youth have evidence of CTE. Take control of your BRAIN

HEALTH! . . . #eht" (rayladysolange Instagram, October 13, 2019).

k.  "I could fill up my feed with so many #EHT success stories . . . concussion

issues . . . #concussion." (lizanne6998 Instagram, Oct. 18, 2019).

l.  "EHT BENEFITS" superimposed over advertisement for movie "Concussion"

and a photo of an NFL player. (rayladysolange Instagram, October 17, 2019).

m.   "Want to repair your head injuries by restoring the Tau Protein that we either naturally lose with age or from suffering a brain injury? Sport Concussion Statistics: "'33% happened at practice. 47% occurred during High School Football. 5.3 Million Americans are living with traumatic brain injury disability. Scientists believe CTE in NFL players began at youth. 1 in 3 men who played contact sports as a youth have evidence of CTE (a chronic disease that resembles Alzheimer's). #neora #eht'"; "EHT BENEFITS" superimposed over advertisement for movie "Concussion" and a photo of an NFL player. (hezpilz Instagram, October 12, 2019).

96.    There are no human clinical trials showing that EHT prevents, reduces the risk of, or treats concussions or CTE, and there are no studies whatsoever, including human clinical trials, that have been conducted on EHT Products themselves related to that claim.

### Defendants' Deceptive Alzheimer's-Related Marketing of EHT Products

97.    Since at least 2015, in the course of advertising, marketing, and promoting EHT Products, Defendants have represented that the products help prevent, reduce the risk of, and treat Alzheimer's disease.

98.    These claims have been made in print, online, and on social media.

99.    As noted above, in a February 2015 press release, Signum claimed that EHT "may be a significant contributor to the reduced risk for consequences of inflammation and for neurodegenerative diseases, such as Alzheimer's Disease, CTE (Chronic Traumatic Encephalopathy) and Parkinson's Disease."

100.    On the ME Sports website, Signum linked EHT to Alzheimer's Disease, describing its

symptoms and touting the purportedly neuroprotective qualities of EHT:



101.    As noted above, at the time Nerium EHT was launched at the Nerium GetReal

Conference in April 2015, Nerium's website had no information on the new Nerium EHT product, so

the ME Sports website was the only source of information about Nerium EHT.  Many Nerium BPs

visited the ME Sports website to learn more about EHT and to purchase samples.

102.    Signum also released a widely circulated video entitled "Signum Biosciences PP2A

Part 2 Tau's Connection to Alzheimer," in which Signum representatives promoted EHT by citing a

study "showing EHT's ability to rescue the effects of hyperphosphorylated tau deficit. . .[i]n a rat

model for Alzheimer's[.]"

103.    In another promotional video for EHT, Signum representatives discuss their family's history of Alzheimer's disease, and conclude the video by explaining that they began developing EHT because "we all really did not want to get Alzheimer's disease."

104.    Nerium's website also includes a description of Nerium EHT's health benefits, and links to a Signum study suggesting that EHT may reduce the risk of Alzheimer's disease.

105.    In the summer of 2015, at Nerium's GetReal Conference, a Signum representative represented to thousands of BPs that:

> we put EHT in a number of different model systems that people have developed to study neurodegenerative disease, and we found that EHT was beneficial—dramatically beneficial in those systems for Parkinson's disease, a disease called Lewy body dementia, diffuse Lewy body disease, which is a common disease that's probably the most overlooked disease I think in—certainly in neurodegeneration and in models for Alzheimer's disease. And then we made an extract in coffee—from coffee to make as a supplement.

106.    Later during the 2015 GetReal Conference, a Signum representative told BPs to try Nerium EHT, "because there is nothing that works in the pharmaceutical industry for stopping the progression of Alzheimer's disease."

107.    Additionally, Defendants cite funding Signum received from the Alzheimer's Drug Discovery Foundation.

108.    Defendants also disseminate claims that EHT assists with Alzheimer's over social media.

109.    In December 2017, Signum published a post to its Facebook page, which has more than 5,000 followers, citing a study that purportedly linked EHT to the prevention of Alzheimer's-related impairments in mice:



110.    Many Nerium BPs then took the Signum post a step further, sharing the post and relying on the EHT study to promote using EHT to prevent or treat Alzheimer's, Parkinson's, or their related impairments:





111.    Each of the posts cited in Paragraph 110 was visible to Signum as well as to anyone with a Facebook account.

112.    Posts similar to those cited in Paragraph 110 are common. Defendants and Nerium BPs frequently make claims over social media that EHT can prevent, reduce the risk of, and treat Alzheimer's disease. Examples of claims made on social media include:

a.    "I love when science tells me AGAIN that I am taking the right supplement to protect against Alzheimer's! EHT works directly on tau protein. Are you doing what you can to prevent Alzheimer's and dementia and other memory loss age related problems?" (Roxy McClure Facebook, November 22, 2016);

b.    "Tau Protein is instrumental in preventing Alzheimer's. EHT protects the memory circuits of the brain." (Molly McConnell Dow Facebook, February 27, 2017);

c.    "Tau protein tangles cause neuronal death associated with Alzheimer's disease. Tau antibodies may treat Alzheimer's. EHT stabilizes Tau protein. Prevention is key!" (Alison Webb Facebook, August 8, 2016);

d.    "Do you know someone that suffered from Alzheimer's? EHT is the only patented product to protect tau protein. It has been featured in multiple medical journals and is in the new PDR." (Mike Steward Facebook, November 16, 2015).

34

e.     "EHT for brain health . . . #alzheimers #dementia . . . #parkinsonsdisease #parkinsons." (Carrie Skowronek Instagram, Sept. 1, 2019).

113.     There are no human clinical trials showing that EHT prevents, reduces the risk of, or treats Alzheimer's disease, and there are no studies whatsoever, including no human clinical trials, that have been conducted on EHT Products themselves related to that claim.

**Defendants' Deceptive Parkinson's-Related Marketing of EHT Products**

114.     Since at least 2015, in the course of advertising, marketing, and promoting EHT Products, Defendants have represented that the products prevent, reduce the risk of, and treat Parkinson's disease.

115.     These claims have been made in print, online, and on social media.

116.     As noted above, in a February 2015 press release, Signum claimed that EHT "may be a significant contributor to the reduced risk for consequences of inflammation and for neurodegenerative diseases," including Parkinson's disease.

117.    On the ME Sports website, Signum linked EHT to Parkinson's Disease, describing its symptoms and touting the purportedly neuroprotective qualities of EHT:



118.    As noted above, at the time Nerium EHT was launched at the Nerium GetReal Conference in April 2015, Nerium's website had no information on the new Nerium EHT product, so the ME Sports website was the only source of information about Nerium EHT.  Many Nerium BPs visited the ME Sports website to learn more about EHT and to purchase samples.

119.    In the summer of 2015, at Nerium's GetReal Conference, a Signum representative represented to thousands of BPs that EHT had been scientifically shown to be "dramatically beneficial" in models for Parkinson's disease.

120.     Defendants also claim to be working with the Michael J. Fox Foundation to lead consumers to believe that EHT is effective in preventing Parkinson's disease.

121.     In many instances, Defendants have gone so far as to claim that their product is endorsed by the Michael J. Fox Foundation or by Michael J. Fox himself.

122.     EHT is not endorsed by the Michael J. Fox Foundation or by Michael J. Fox.

123.     Defendants' repeated use of the Michael J. Fox Foundation to market their supplements led the foundation to send Nerium a letter demanding that they remove any references to the foundation in their marketing.

124.     Nevertheless, Defendants continue to use their purported affiliation with the Michael J. Fox Foundation to lead consumers to believe that EHT is effective in preventing Parkinson's disease, including through continued false claims that the foundation "endorses" EHT.

125.     In addition, Defendants and Nerium BPs frequently make claims over social media that EHT can prevent, reduce the risk of, and treat Parkinson's disease. Examples of claims made on Facebook include:

   a.     "The Michael J Fox Foundation for Parkinson's research endorses EHT." (Molly McConnell Dow, February 27, 2017);

   b.     "Do you know someone with Parkinson's? Nerium EHT CAN HELP!" (Joanie Sullivan, June 15, 2016);

   c.     "Michael J Fox endorses EHT!" (Alex Forero, October 27, 2015);

   d.     "Do you or anyone you know suffer from Parkinson's Disease? In a study published in 2013, EHT, the main ingredient in Nerium's EHT supplement was tested and found to alleviate the symptoms of Parkinson's." (Skincaring.Nerium.com, December 17, 2015);

e.   "Love my Princeton scientists. Listen to this video explaining EHT benefits…geared toward Parkinson's. Alzheimer's. Dementia." (Amy E. Tate-Matthus, March 10, 2016).

f.   "EHT for brain health . . . #alzheimers #dementia . . . #parkinsonsdisease #parkinsons." (Carrie Skowronek Instagram, Sept. 1, 2019).

g.   "Research and Funded by the Michael J. Fox Foundation . . . Had a concussion . . . family history of Alzheimer's or Parkinson's . . . Brain health is so important!!! #EHT." (Maria Cipriano Instagram, October 10, 2019).

126.   There are no human clinical trials showing that EHT prevents, reduces the risk of, or treats Parkinson's disease, and there are no studies whatsoever, including human clinical trials, that have been conducted on EHT Products themselves related to that claim.

127.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission. Nerium BPs continue to make false income claims and unsubstantiated claims about Nerium EHT, and Nerium's compensation plan continues to incentivize recruiting new BPs over product sales.

## VIOLATIONS OF THE FTC ACT

128.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

129.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

130.   Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.

131.     For the purposes of Section 12 of the FTC Act, EHT Products are a food or drug as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. § 55(b) and (c). As set forth below, Defendants have engaged and are continuing to engage in such unlawful practices in connection with the marketing and sale of EHT Products.

## COUNT I
### Illegal Pyramid
### (Against Defendants Nerium International and Jeff Olson)

132.     As alleged above, Defendants operate or promote participation in an unlawful scheme in which participants pay money to the company in return for which they receive (1) the right to sell products, and (2) in return for recruiting other participants into the program, the right to receive rewards which are unrelated to the sale of products to the ultimate users.

133.     Defendants' operation and promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### False Earnings Claims
### (Against Defendants Nerium International and Jeff Olson)

134.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in the Nerium program, Defendants represent, directly or indirectly, expressly or by implication, that consumers who become Nerium BPs are likely to earn substantial income.

135.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 134 consumers who become Nerium BPs are not likely to earn substantial income.

136.     Therefore, Defendants' representation as set forth in Paragraph 134 is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III
### False or Unsubstantiated Efficacy Claims
### (Against All Defendants)

137.     Through the means described in Paragraphs 51 through 126, Defendants represent, directly or indirectly, expressly or by implication, that:

a.     EHT or EHT Products prevent, reduces the risk of, or treat CTE or brain injuries, including concussions;

b.     EHT or EHT Products prevent, reduces the risk of, or treat Alzheimer's disease; and

c.     EHT or EHT Products prevent, reduces the risk of, or treat Parkinson's disease.

138.     The representations set forth in Paragraph 137 are false or misleading, or were not substantiated at the time the representations were made.

139.     Therefore, the making of the representations as set forth in Paragraph 137 constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT IV
### False Establishment Claims
### (Against All Defendants)

140.     Through the means described in Paragraphs 51 through 126, Defendants represent, directly or indirectly, expressly or by implication, that:

a.     EHT or EHT Products are scientifically proven to prevent, reduce the risk of, or treat CTE or brain injuries, including concussions;

> b.    EHT or EHT Products are scientifically proven to prevent, reduce the risk of, or treat Alzheimer's disease; and
>
> c.    EHT or EHT Products are scientifically proven to prevent, reduce the risk of, or treat Parkinson's disease.

141.    The representations set forth in Paragraph 140 are false and misleading.

142.    Therefore, the making of the representations as set forth in Paragraph 140 constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

### COUNT V
### Means and Instrumentalities
### (Against All Defendants)

143.    By furnishing Nerium's BPs with (1) promotional materials to be used in recruiting new participants that contain false and misleading representations set forth in Paragraph 134 above, or (2) marketing and advertising materials that contain the false, misleading, or unsubstantiated representations set forth in Paragraphs 137 and 140, Defendants provide the means and instrumentalities for the commission of deceptive acts and practices.

144.    Therefore, Defendants' practices, as described in Paragraph 143, constitute deceptive acts and practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

### CONSUMER INJURY

145.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

146.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order preserving assets, and an accounting;

B.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill- gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

ALDEN F. ABBOTT
General Counsel

Dated:                                           s/ David A. O'Toole
                                          DAVID A. O'TOOLE
                                          KATHARINE ROLLER
                                          GUY G. WARD
                                          Federal Trade Commission, Midwest Region
                                          230 S. Dearborn, Suite 3030
                                          Chicago, Illinois 60604
                                          Telephone: (312) 960-5634
                                          Facsimile: (312) 960-5600
                                          Email: dotoole@ftc.gov
                                                     kroller@ftc.gov
                                                     gward@ftc.gov

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION